UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                 )
EUGENE W. DOWNING,               )
             Plaintiff,          )
                                 )
v.                               )        CIVIL ACTION NO. 09-11572-PBS
                                 )
MICHAEL J. ASTRUE,               )
             Commissioner of     )
             Social Security,    )
             Defendant.          )
_____)
```

**MEMORANDUM AND ORDER**

February 28, 2011

SARIS, U.S.D.J.

## I.  INTRODUCTION

Pro se plaintiff Eugene W. Downing, who suffers from chronic chest pain, fatigue and other ailments, appeals from the final decision of Commissioner Michael J. Astrue denying him Social Security disability insurance benefits.  After review of the record, the Court **DENIES** plaintiff's motion to reverse the Commissioner's decision, and **ALLOWS** defendant's motion to affirm the decision.

## II.  BACKGROUND

### A.   Background and Employment History

Plaintiff was born on August 13, 1946.  (Administrative Transcript ("Tr.") at 82.)  He served in the United States Army and spent time in Korea.  (Tr. 24.)  After earning a Bachelor of

Science degree in Accounting, he went to Suffolk University Law School and obtained a law degree. (Tr. 19.) In 2005, after practicing law for twenty years, plaintiff resigned from the bar. (Tr. 21.)

For a period of nine months, from September 2006 until June 2007, plaintiff worked for the IRS as an accounting auditor. (Tr. 20.) Several months after he was terminated[1], plaintiff obtained a part-time position with the Census Bureau, from September 2007 until May 2008. (Tr. 20.) From March 31, 2008, until August 4, 2008, plaintiff also worked as an accounting clerk, a job that he obtained through a temporary staffing agency. (Tr. 19.) Plaintiff has not engaged in any substantial, gainful activity since August 4, 2008. (Tr. 9, 19.)

B. **Medical History**

1. **Physical Ailments**

In July 2005, plaintiff underwent surgery to replace his pacemaker device. (Tr. 335-37.) Subsequently, plaintiff experienced chest pain, shortness of breath, and fatigue. (See, e.g., Tr. 359, 361, 370.) This pain was ongoing through the second half of 2005 and much of 2006, during which time plaintiff

---

[1] Plaintiff testified that the IRS terminated him because "they did a background check on, on me and they decided that because I had resigned from the, the Bar, that they didn't feel like I should, could work for them. So they terminated me." (Tr. 21.) In his disability application, however, plaintiff reported that he was terminated for "violating work rules." (Tr. 110, 117.)

had regular checkups for his pacemaker. (Tr. 157, 389, 401, 457.) Plaintiff was seen throughout the relevant time period by Dr. Richard Alweis, an internist and an Instructor in Medicine at Harvard Medical School. (Tr. 167, 541.)

On February 20, 2006, plaintiff was seen by Dr. Panos Voukydis, an arrhythmia specialist. Dr. Voukydis noted that plaintiff had applied for disability on the basis of a "poorly defined and undiagnosed discomfort." (Tr. 451, 457.) Approximately a week later, after reviewing further documentation, Dr. Voukydis stated that "I cannot find a justification in giving him permanent disability on the basis of this pain." (Tr. 567.)

In February 2007, plaintiff was seen by his treating physician, Dr. Richard Alweis. (Tr. 541, 167.) Dr. Alweis observed that plaintiff continued to have chest pain, but that the symptoms did not seem to be cardiac-related. (Tr. 541.) The following month, plaintiff reported to Mount Auburn Hospital emergency room with complaints of right-sided chest pain, fatigue and headache. (Tr. 257.) After being admitted overnight, plaintiff was discharged with no complaints or symptoms. (Tr. 257-58.)

In July 2007, Dr. Alweis completed a general assessment of plaintiff's functional capacity. (Tr. 486.) Dr. Alweis noted that plaintiff had a chronic chest pain syndrome, which he developed after the pacemaker replacement. (Id.) Dr. Alweis

-3-

recounted plaintiff's symptoms of constant pain and fatigue after
the replacement of the pacemaker, "which defied pain control
measures," and stated: "these symptoms have interfered with his
ability to concentrate to the point that his job performance was
impossible." (<u>Id.</u> at 486.)  In addition, he stated that
plaintiff was able to lift and carry no more than 10 pounds,
although he had no limitations in sitting, and could stand and
walk with no significant limitation, other than tiring easily.
(<u>Id.</u>)

     In August 2007, Dr. Alweis completed a residual functional
capacity questionnaire as part of plaintiff's application for
disability benefits.  (Tr. 582-87.)  He reported that plaintiff
continued to complain of chest pain, with an intensity rating of
2-4 on a 10-point pain scale, and that plaintiff's pain was
frequently severe enough to interfere with attention and
concentration.  (Tr. 582-83.)  Nevertheless, Dr. Alweis observed
that plaintiff could continuously sit for two hours at a time,
could frequently lift and carry less than ten pounds, and
occasionally lift and carry more than ten pounds.  (Tr. 585.)
However, he reiterated that pain "has significantly impaired his
ability to concentrate for any prolonged period of time." (Tr.
586.)

     In November 2007, plaintiff was seen at Beth Israel
Deaconess Medical Center Device Clinic, and was reported to be
"doing well."  (Tr. 599.) Plaintiff reported occasionally

experiencing chest discomfort, but noted an increase in stamina.
(Id.)  In addition, his pacemaker was functioning appropriately.
(Tr. 600.)  The same month, however, plaintiff saw Dr. Alweis and
complained of back pain after being rear-ended in an automobile
accident.  (Tr. 641.)  After the accident, plaintiff was
ambulatory on the scene and declined hospital evaluation after
being assessed on-site by medical personnel.  (Id.)

In March 2008, plaintiff visited the Bedford VA Medical
Center, complaining of neck and back pain.  (Tr. 638, 673.)  An
x-ray of his back revealed degenerative changes, but noted the
vertebrae "are of normal height and alignment."  (Tr. 673.)
There were also no fractures or dislocations.  (Id.)

In June 2008, plaintiff reported that his chest pain had
subsided somewhat.  (Tr. 595.)  He reported more energy to do
activities, and denied any recent chest pain with exertion,
shortness of breath with exertion, lightheadedness, or dizziness.
(Tr. 596.)

In September 2008, plaintiff presented to treating physician
Dr. David Farrar.  (Tr. 632.)  Plaintiff reported neck pain
resulting from the motor vehicle accident in November 2007.
(Id.)  Plaintiff also complained of ongoing chest pain at the
site of the pacemaker.  (Id.)  Dr. Farrar suggested he seek
physical therapy, undergo a CT scan, and see a general
cardiologist.  (Id.)

The CT scan did not reveal fracture or dislocation, but did find left degenerative facet changes at the C3-C4 vertebrae. (Tr. 630.) Plaintiff began physical therapy in October 2008 for neck pain, but also complained of back pain during one of his sessions. (Tr. 649-50.)

In February 2009, plaintiff had a syncopal, or temporary loss of consciousness, episode while driving and was hospitalized. (Tr. 718-20.) Plaintiff was instructed not to drive for six months. That same month, while being evaluated at the VA hospital for hypertension and possible diabetes, plaintiff reported that he exercises five times per week and gardens. (Tr. 692.) At that time, he was observed to have soreness at the pacemaker site. (Id.)

### 2. Depression

In March 2006, plaintiff was evaluated by Dr. Peter Mosbach, a clinical psychologist. (Tr. 488-90.) The evaluation revealed that plaintiff suffered from moderate depression. (Tr. 489.) Dr. Mosbach found, however, that plaintiff was "alert, oriented, and cooperative." (Id.) Plaintiff denied any suicidal ideation or plan. (Id.) He reported that he had previously been prescribed an anti-depressant, but stated that he stopped taking it after thirty days because it had no effect on his mood. (Id.) Plaintiff was not prescribed any medications by Dr. Mosbach. (Tr. 488-91.) Plaintiff had never previously received mental

health treatment.  (Tr. 489.)

A personality test revealed that plaintiff was someone who focused on somatic complaints, and that he experiences an increase in physical symptoms in response to stressful life events.  (Tr. 489.)  On the Wechsler Adult Intelligence Scale-3 (WAIS-3), plaintiff had a verbal IQ of 133, which placed him at the 99th percentile of his age group.  (Id.)  Plaintiff's Global Assessment of Functioning (GAF) was 45, indicating a "serious impairment in social and occupational functioning."  (Tr. 491.)

In December 2006, plaintiff was screened for depression at the VA hospital and the results were negative.  (Tr. 702.)  In August 2007, plaintiff reported feeling "somewhat down about his inability to work," but declined to see a psychotherapist.  (Tr. 589.)  In February 2008, during treatment at the VA hospital, plaintiff was again negative for depression.  (Tr. 699.)  A depression screen given in February 2009 was similarly negative. (Tr. 689.)

C.  **Procedural History**

Plaintiff applied for Social Security disability benefits on June 8, 2007, alleging disability beginning June 1, 2007 due to depression, fatigue, concentration problems and cardiac pain.[2] (Tr. 38, 82, 109.)  The Social Security Administration denied his

_____

[2] Prior to this application, plaintiff received disability benefits for a closed period from August 1, 2005 to September 11, 2006. Thereafter, plaintiff returned to substantial gainful activity.  (Tr. 7.)

-7-

application at the initial review level on August 16, 2007, and plaintiff filed a timely request for reconsideration. A federal reviewing official determined that plaintiff was not disabled on July 12, 2008. (Tr. 34, 38, 45, 48.) Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on August 27, 2008. (Tr. 52.)

A hearing took place before ALJ James H. Packer on March 20, 2009, during which plaintiff was represented by counsel. (See Tr. 16-32.) On the day of the hearing, plaintiff amended the alleged onset date of his disability to August 4, 2008.[3] (Tr. 7, 94.) At the hearing, plaintiff testified extensively about his education, work history, the nature of his injuries, and his past medical treatment. (Tr. 19-32.) He stated that he experiences chest pain, and that this pain distracts him from concentrating on daily activities. (Tr. 21-22.) He takes medication to treat his near-constant pain. (Id.) Plaintiff explained that he is constantly fatigued, that his medications sometimes cause dizziness, and that he experiences numbness on his left side. (Tr. 22-24.) He stated that he has tremors in both hands as a result of an initial pacemaker, which was implanted in 1998. (Tr. 22-24.)

Plaintiff also testified that, while in the United States

_____

[3] August 4, 2008, the new alleged onset date, was the same day as plaintiff's last day of employment as an accounting clerk, a job that was "temporary by nature." (Tr. 19-20.)

Army, he was stationed overseas in Korea from 1969-1970, and has since been diagnosed by the VA with pre-diabetes potentially caused by exposure to Agent Orange. (Tr. 24.) He also remarked that he had experienced left-sided neck pain after being involved in a motor vehicle accident in November 2007. (Tr. 26.) Plaintiff stated that he can lift five pounds without trouble and walk about 500 feet before getting tired, but explained that he has no limitations as far as sitting down. (Tr. 29.) He also testified that he has consulted with mental health providers for depression. (Tr. 30.) Plaintiff stated that the combination of the pacemaker, chest pain, numbness, tremor and fatigue contribute to make it difficult to work for an employer full-time. (Tr. 31.)

In his written decision dated April 17, 2008, ALJ Packer followed the mandatory five-step sequential evaluation process established by the Commissioner to determine whether a claimant is disabled. (Tr. 4-15.) See 20 C.F.R. § 404.1520. At step one, the ALJ found that plaintiff had not been engaged in substantial gainful employment since his alleged onset date of August 4, 2008. See 20 C.F.R. § 404.1520(a)(4)(i). (Tr. 9.) At step two, the ALJ found that the plaintiff's heart disorder constituted a severe impairment. See 20 C.F.R. § 404.1520(a)(4)(ii). (Tr. 10.) The ALJ also found that plaintiff had several non-severe impairments, including hand tremors,

hernia, hypertension, pre-diabetes mellitus and dysthymia.  (Tr. 10-11.)

At step three, the ALJ determined that plaintiff's impairments did not meet the criteria of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  Next, the ALJ found that, despite the combination of severe and non-severe impairments, plaintiff still retained the residual functional capacity ("RFC") for light work.  (Tr. 13-15.)  At step four, the ALJ found that plaintiff could perform his past work as an accountant.  See 20 C.F.R. § 404.1520(a)(4)(iv).  (Tr. 15.) Thus, the ALJ concluded that plaintiff was not disabled and denied his claim for disability benefits.  (Tr. 15.)

On July 22, 2009, the Decision Review Board notified plaintiff that it had not completed review of the claim during the time allowed.  (Tr. 1.)  As a result, the decision of the ALJ became final.  (Id.)  On September 18, 2009, having exhausted his administrative remedies, plaintiff filed the present appeal, seeking review of the ALJ's decision.

### III.  STANDARD

### A.  Disability Determination Process

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a

disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  For the purpose of

determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage
> in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment
> which can be expected to result in death or which has
> lasted or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).

An impairment can only be disabling if it "results from

anatomical, physiological, or psychological abnormalities which

are demonstrable by medically acceptable clinical and laboratory

diagnostic techniques." Id. § 423(d)(3).  Furthermore, "[a]n

individual shall be determined to be under a disability only if

his physical or mental impairment or impairments are of such

severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists

in the national economy." Id. § 423(d)(2)(A).

The Commissioner has developed a five-step sequential

evaluation process to determine whether a person is disabled.  20

C.F.R. § 404.1520(a)(4); Goodermote v. Sec'y of Health & Human

Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).  "Step one determines

whether the plaintiff is engaged in 'substantial gainful

activity.'  If he is, disability benefits are denied.  If he is

not, the decision maker proceeds to step two, which determines

whether the claimant has a medically severe impairment or

combination of impairments." <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-41 (1987) (internal citations omitted). To establish a severe impairment the claimant must "show that he has an 'impairment or combination of impairments which significantly limits . . . the abilities and aptitudes necessary to do most jobs.'" <u>Id.</u> at 146 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).

If the claimant has a severe impairment, the third step is to determine "whether the impairment is equivalent to one of a number of listed impairments that . . . are so severe as to preclude substantial gainful activity." <u>Id.</u> at 141. If so, the claimant is presumed conclusively to be disabled. <u>Id.</u> If not, before applying the fourth step, the reviewing body must determine the claimant's residual functional capacity, based on relevant medical and other evidence in the case record, to determine what types of work the claimant can do. 20 C.F.R. §§ 404.1520(a)(4), 404.1520(e). If the claimant does not suffer from one of the listed impairments, the fourth step evaluates whether the impairment prevents the claimant from performing his past work. <u>Bowen</u>, 482 U.S. at 141 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The claimant is not disabled if he is able to perform his past work. <u>Id.</u> (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)). If he cannot perform his past work, the burden shifts to the Commissioner on the fifth step to prove

that the claimant "is able to perform other work in the national economy in view of his age, education, and work experience."  <u>Id.</u> at 142, 146 n.5.  During steps one, two, and four, the burden of proof is on the claimant.  <u>Id.</u> at 146, n.5.  At the fifth step, the burden is on the Commissioner.  <u>Id.</u> at 142.  If the Commissioner fails to meet this burden, the claimant is entitled to benefits.  <u>Id.</u>

**B.    <u>Standard of Review</u>**

In reviewing disability and disability insurance decisions made by the Commissioner, this Court does not make de novo determinations.  <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981).  Rather, it "must affirm the [ALJ's] findings if they are supported by substantial evidence." <u>Cashman v. Shalala</u>, 817 F.Supp. 217, 220 (D. Mass. 1993); <u>see also</u> <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987) (stating that the ALJ's determination must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence").

Substantial evidence is "more than a mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  Substantial evidence means such relevant evidence as a "reasonable mind, reviewing the evidence in the record as a whole, could accept . .

. as adequate to support [the ALJ's] conclusion." <u>Irlanda Ortiz</u>
<u>v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir.
1991) (quoting <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647
F.2d 218, 222 (1st Cir. 1981)).  In reviewing the record for
substantial evidence, the Court is "to keep in mind that 'issues
of credibility and the drawing of permissible inferences from
evidentiary facts are the prime responsibility of the Secretary."
<u>Rodriguez</u>, 647 F.2d at 222 (quoting <u>Rodriguez v. Celebrezze</u>, 349
F.2d 494, 496 (1st Cir. 1965)).  When a conflict exists in the
record, the ALJ bears the duty to weigh the evidence and resolve
material conflicts in testimony.  <u>See Richardson</u>, 402 U.S. at
399; <u>Irlanda Ortiz</u>, 955 F.2d at 769.  An ALJ's findings of fact,
however, are "not conclusive when derived by ignoring evidence,
misapplying the law, or judging matters entrusted to experts."
<u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999).

    In addition, the Court must consider whether the proper
legal standard was applied.  "Failure of the [ALJ] to apply the
correct legal standards as promulgated by the regulations or
failure to provide the reviewing court with the sufficient basis
to determine that the [ALJ] applied the correct legal standards
are grounds for reversal." <u>Weiler v. Shalala</u>, 922 F. Supp. 689,
694 (D. Mass. 1996) (citing <u>Wiggins v. Schweiker</u>, 679 F.2d 1387,
1389 (11th Cir. 1982)).

**IV.  <u>DISCUSSION</u>**

## A.    **Step Three Analysis**

Plaintiff argues that the ALJ erred at step three of his analysis by determining that plaintiff did not have a listed impairment.  More specifically, plaintiff appears to argue that, based on the medical evidence and his own testimony, the ALJ should have found that his depressive and pain syndromes met the criteria of paragraph B of Listing 12.04.  In his opinion, the ALJ concluded that plaintiff could not satisfy at least two of the four criteria listed in paragraph B.  This Court concludes that the ALJ's decision is supported by substantial evidence. Listing 12.04, upon which plaintiff implicitly relies, deals with depression and concentration.[4]  Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  Id. § 404.1525(c)(3).

The criteria in paragraph B of Listing 12.04 can be satisfied by a showing of at least two of the following functional limitations: 1) a marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation,

---

[4] Affective Disorders under Listing 12.04 are characterized as "[a] disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."  20 C.F.R. Part 404, Subpart P, App. 1, § 12.04.

each of extended duration.  20 C.F.R. Part 404, Subpart P, App. 1, § 12.04(B).  (Tr. 12.)  As a standard for measuring the degree of limitation, "marked" refers to "more than moderate but less than extreme."  20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C).  In addition, the degree of limitation must interfere seriously with a person's "ability to function independently, appropriately, effectively, and on a sustained basis."  Id.

     With respect to the first 12.04(B) factor - activities of daily living - the regulations give examples that include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  Id. § 12.00(C)(1).  In his application for disability, plaintiff stated that he is able to prepare meals for himself and his spouse, and can perform such activities as shopping, driving, answering the phone and making the bed.  (Tr. 120-22.)  While plaintiff did note that he needed help for more complex tasks, such as plumbing or electrical work, he handles basic household chores and repairs on his own.  (Tr. 122.)  Plaintiff goes outside daily, goes swimming weekly, and reads and watches television.  (Tr. 123-24.) Plaintiff claims that his "inability to keep a job" is evidence of a restriction on daily living.  However, there is no evidence in the record suggesting that plaintiff's termination from his most recent positions was precipitated by any medical

-16-

difficulties.  Thus, the Court finds that substantial evidence existed for the ALJ to conclude plaintiff did not have a marked restriction on his daily activities.

The second factor, social functioning, "refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others."  20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C)(2).  Examples of impaired social functioning can include a history of altercations, firings, fear of strangers, evictions, avoidance of interpersonal relationships or social isolation.  Id.  Here, the record does not support a finding of impaired social functioning.  Plaintiff reported spending time with his relatives, spouse and children, going shopping and going to church.  (Tr. 125.)  In addition, plaintiff does not report having trouble with social interactions.  (Tr. 125.)  Again, the ALJ's conclusion that this criteria is not satisfied is supported by substantial evidence.

The third factor - concentration, persistence, or pace - refers to "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C)(3).  Further, while the regulations state that limitations in concentration, persistence and pace are "best observed in work settings," major limitations in this area can often be assessed through clinical

examination or psychological testing.  Id.  At the hearing, plaintiff testified he has difficulty concentrating and has to take frequent breaks.  (Tr. 22-23.)  He also testified that he experiences constant fatigue and chest pain that interfere with his concentration, and that his medications make him tired and dizzy.  (Tr. 28.)  Two years before the alleged onset of his disability, plaintiff's treating psychiatrist recorded his Global Assessment of Functioning ("GAF") as a 45, which indicates a serious impairment in social or occupational functioning.  Furthermore, in his disability report, plaintiff stated that his condition impacts his memory and that it takes longer to complete tasks.  (Tr. 109.)  Plaintiff's treating physician, Dr. Alweis, opined that plaintiff's pain significantly impairs his ability to concentrate for "any prolonged period of time."  (Tr. 586.)

The evidence is not so clear cut, though.  In a VA Hospital visit on March 12, 2008, plaintiff denied having memory difficulties.  (Tr. 696.)  In addition, in a function report, plaintiff noted that he can concentrate for 2-3 hours without difficulty.  (Tr. 125.)  While plaintiff completed personality tests in March 2006 that indicated he suffered from moderate depression, the same psychological evaluation noted that plaintiff "had no difficulty with serial seven's and was able to recall 3/3 items after a five minute period of delay."[5]  (Tr.

---

[5] According to the regulations, in mental status examinations "concentration is assessed by tasks such as having

592.)  Further, the report noted that plaintiff had "no evidence of any deficits in memory or attention/concentration based on his responses." (Tr. 593.)  Also in 2006, plaintiff was seen by an arrhythmia specialist, who concluded that he could not "find a justification in giving him permanent disability on the basis of this pain." (Tr. 567.)

The ALJ acknowledged that plaintiff's chest discomfort could interfere with his ability to maintain attention and concentration, but concluded that his pain caused only mild difficulties because he had the ability to work in 2006 and 2007, but left work for non-medical reasons.  Plaintiff had a position as an accounting auditor with the IRS that lasted from September 2006 until June 2007.  (Tr. 20.)  At the hearing before the ALJ, he testified that he was terminated because the IRS performed a background investigation.  (Tr. 21.)  In his initial application for disability benefits, plaintiff reported that he was terminated for "violating work rules." (Tr. 110, 117.)  In either case, it does not appear that he was terminated for reasons related to an inability to concentrate.

As such, there was conflicting evidence as to restrictions on plaintiff's ability to concentrate.

The fourth and final factor, repeated episodes of decompensation, refers to "exacerbations or temporary increases

you subtract serial sevens or serial threes from 100." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C)(3).

in symptoms or signs accompanied by a loss of adaptive functioning." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C)(4). Episodes of decompensation may be inferred from documentation of the need for a more structured psychological support system or medical records showing significant alterations in medicine. <u>Id.</u> A claimant must experience three episodes within one year to be found to have "repeated" episodes of decompensation. <u>Id.</u> Here, the ALJ correctly noted that the record does not reflect any such episodes. (Tr. 12.)

Overall, the ALJ's step three determination that plaintiff could not satisfy at least two of the factors listed in paragraph B of Listing 12.04 was supported by substantial evidence. While acknowledging that plaintiff's various conditions caused mild difficulties in daily living and social functioning, the ALJ had ample support for finding that plaintiff did not have "marked" difficulties in two or more of the B criteria. (Tr. 12.)

**B. Step Four Analysis**

Next, plaintiff attacks the ALJ's finding that plaintiff could return to his former work as an accountant, and, accordingly, was not disabled under step four of the sequential evaluation process. (Tr. 15.)

At step four, the initial burden "is on the claimant to show that she can no longer perform her former work because of her impairments." <u>Manso-Pizarro v. Sec'y of Health & Human Servs.</u>,

76 F.3d 15, 17 (1st Cir. 1996) (per curiam).  This initial burden requires the claimant to "lay the foundation as to what activities her former work entailed, [and to] . . . point out (unless obvious) - so as to put in issue - how her functional incapacity renders her unable to perform her former usual work."  Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 5 (1st Cir. 1991) (per curiam).  Once a claimant meets this initial burden, "the ALJ must compare the physical and mental demands of [the claimant's] past work with current functional capability."  Manso-Pizarro, 76 F.3d at 17.

While plaintiff has complained of chest pain since his pacemaker was replaced in 2005, he was employed as an IRS accounting auditor for nine months, from September 2006 until June 2007, before he was terminated.  (Tr. 20-21, 335-37, 357.)  Thereafter, from March 31, 2008 until August 4, 2008, plaintiff worked as an accounting clerk, despite the chest pain and claimed inability to concentrate.  (Tr. 19.)  By plaintiff's own admission, this latter job only ended because it was temporary by nature, not due to plaintiff's physical or mental ailments.  (Tr. 19-20.)

Here, plaintiff's treating physician, Dr. Alweis, a primary care physician, concluded that plaintiff had chronic chest pain syndrome caused by the pacemaker that interfered with his ability to work.  However, the ALJ did not give controlling weight to his opinion because Dr. Alweis was not a cardiologist and "after

these opinions were given, the claimant had returned to work earning substantially gainful activity." (Tr. 14). The ALJ also relied on the opinion of the non-treating physician who found that plaintiff was limited to performing light work.[6] It is well established that an ALJ should generally give more weight to a treating physician's opinion in making disability determinations. 20 C.F.R. § 404.1527(d)(2). Here, though, the proof is in the pudding. Although, plaintiff clearly experiences chest pain, he engaged in substantial gainful activity _after_ his treating physician said it was impossible for him to work and was terminated for non-medical reasons. Therefore, when the record is considered as a whole, the ALJ's step four determination that plaintiff could perform his past work as an accountant is supported  by substantial evidence. See, e.g., Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (holding that a court must "review the evidence in the record as a whole" when determining whether a decision of the Commissioner

---

[6] Dr. Barbara Scolnick, a medical consultant for the Social Security Administration, found that plaintiff had atypical chest pain, and was limited to performing light work. (Tr. 575.) Dr. Scolnick, a non-treating physician, reviewed the medical evidence in the record and prepared a residual functional capacity assessment form on August 14, 2007, accompanied by brief medical findings. (Tr. 574-81.) Throughout the record, various physicians noted that plaintiff's continued chest pain was "atypical". For example, Dr. Michael Kjelsberg, a cardiologist who examined plaintiff on March 1, 2006, noted that he was "somewhat at a loss to come to any sort of insight for conclusion regarding Mr. Downing's present symptoms. His chest pain issue certainly sounds atypical . . . ." (Tr. 565.)

is supported by substantial evidence).

**<u>ORDER</u>**

Defendant's Motion for an Order Affirming the Decision of the Commissioner [Docket No. 17] is **<u>ALLOWED</u>**.  Plaintiff's Motion to Reverse the Decision of the Commissioner [Docket No. 2] is **<u>DENIED</u>**.


<u>/s/ PATTI B. SARIS</u>
Patti B. Saris
United States District Judge